UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

"IN ADMIRALTY"

PROGRESSIVE AMERICAN
INSURANCE CO.,

       Plaintiff,

v.                          CASE NO.:  3:16-cv-00116-MCR-EMT

ROBERT WEBSTER,

       Defendant.

_____/

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant, Mr. ROBERT WEBSTER, by and through undersigned

counsel, and pursuant to the Federal Rules of Civil Procedure and Local Rules of the United

States District Court for the Northern District of Florida files his Memorandum in Opposition to

Plaintiff's Motion for Summary Judgment, (Doc. No. 39), and states as follows:

**INTRODUCTION**

On March 18, 2016, Plaintiff, PROGRESSIVE AMERICAN INSURANCE CO.

(hereinafter PROGRESSIVE), filed its Complaint for Declaratory Judgment against Defendant,

Mr. WEBSTER, on the question of insurance policy coverage for a loss suffered by Defendant

on his insured vessel.  Plaintiff seeks the Court to determine if the contract for marine insurance

entered between PROGRESSIVE and Mr. WEBSTER provides for coverage of the loss Mr.

WE#BSTER sustained when his vessel, the M/Y FINAL DRAW, sank at her dockage in

Navarre, Florida on or about February 3, 2016.  In its Complaint, PROGRESSIVE alleges that

the vessel was unseaworthy at the inception of the policy, thus rendering the policy void, further

1

she was unseaworthy when she sank, also voiding the policy and finally, the unseaworthiness of the FINAL DRAW caused her to sink on the evening of February 3, 2016.  As will be made clear below, not only is there a genuine dispute of material facts that require this Honorable Court to deny the Motion and proceed to a trial on the merits, but it is clear that the contrary to PROGRESSIVE's assertion, the FINAL DRAW was seaworthy.  She was seaworthy when the policy was renewed and seaworthy throughout, to the very moment she sank.

Motion for Summary Judgment by Plaintiff should be denied. Mr. WEBSTER, maintains that a genuine dispute of material facts exists in this case and this case should go before a fact finder.

<u>STATEMENT OF DISPUTED FACTS</u>

**Facts in genuine dispute**

With regard to the plain language of the insurance policy (Doc. No. 39 at 1-2, para. A), there can be no dispute. But from that point on, however, all remaining factual assertions made by the Plaintiff in its argumentative motion are, *in fact*, in significant dispute.

Mr. WEBSTER testified that he maintained his vessel to the point that he had purchased and replaced the engines and changed fuel at significant expense.  (*See* Doc. No. 39-4 at 33:10-34:20.)  Mr. WEBSTER did not have to replace or repair the top-cover or seat cushions for the first twelve (12) years of ownership – the covers had lasted so long because he had maintained them well.  (*See id*. at 37:15-38:5; *see also* Ex. A at 1.)  Mr. WEBSTER's Affidavit is attached hereto and made a part herein as Exhibit A.  While the FINAL DRAW was at Mr. Keegan's residence, Mr. WEBSTER did not navigate the vessel, (*accord* Doc. No. 39 at 3), but Mr. Keegan did (Doc. No. 39-3 at 17:8-14 and Doc. No. 39-4 at 43:13-19).  The vessel's bottom did have barnacles, but Mr. WEBSTER clearly testified that the metal objects under the boat, i.e., the

props, shafts, rudders, etc., were coated with "Speed Prop" which is a product that dislodges sea growth when the vessel is operated in navigation. (Doc. No. 39-4 at 46:18-47:3) In addition, this fact is inconsequential as it does not cause water entry or leaks, or affect the seaworthiness of the FINAL DRAW.

PROGRESSIVE disparages at length the vessel's torn cover, (Doc. No. 39 at 3), without divulging to the Court that the cover is merely a cockpit cover, (Doc. No. 39-4 at 93:22), that protects the interior and passengers from the sun (Doc. No. 39-4 at 37:6-13). Plaintiff insinuates that the cover would have kept out the rain, which is factually untrue because rain water runs out of the cockpit (*id*. at 94:5-6), and because the FINAL DRAW is a self-bailing boat (Ex. A at 1). The fact that the *cockpit cover* was not on the vessel and rainwater was allowed to come into the cockpit – then run-off into the bilges - for twenty-one (21) months without incident, shows the irrelevance of the cover for purposes of keeping water out of the vessel. (*See* Doc. No. 39 at 5.) Moreover, a brand-new top was located in Bill Keegan's garage waiting to be attached in the Spring, showing the owner had no intent to keep a torn cover in use. (Ex. B at 2.)

In November 2015, Bill Keegan found water in the vessel, (Doc. No. 39 at 3), and called Mr. WEBSTER who went to Mr. Keegan's house to assist in draining the vessel with the use of a sump pump (*id*.). Once the water was pumped out, Mr. Keegan and Mr. WEBSTER discovered debris had blocked the operation of the bilge pump, (Doc. No. 39 at 3), and they cleared the debris.[1] Inexplicably, PROGRESSIVE asserts in its motion that Keegan and WEBSTER could not determine the cause of the bilge pump's failure at that time, (*id*.), even though it is obvious that the aforementioned debris lodged in the bilge pump had caused the malfunction (Doc. No.

---

[1] The Affidavit of Mr. Bill Keegan is attached hereto and made a part herein as Exhibit B.

39-3 at 15:15 & 20:14-21; Ex. A at 2; Ex. B at 2).  Mr. Richard Schiehl[2] reflects that Mr. WEBSTER properly acted to dewater the vessel and remove the debris that had blocked the bilge on November 2015.  (See Ex. C at 2.)  Contrary to PROGRESSIVE's assertions, the bilge pumps were operational after the November 2015 incident, because the vessel was dry in December 2015 according to testimony by Mr. Keegan.[3]  (*See* Doc. No. 39-3 at 22:18-23.) PROGRESSIVE's statement, that "water was entering" the vessel is inaccurate and wholly refuted by the competent evidence of record. (See Doc. No. 39 at 3-4.)

The starboard engine was not "dismantled" or "inoperable," as those terms are generally understood.[4]  (Doc. No. 39 at 4.)  The engine was awaiting replacement of a serpentine belt, which would have taken less than five (5) minutes to effect.  (Ex. B at 1 and Ex. C at 2.) PROGRESSIVE also characterizes the generator as "inoperable" because it too was in the midst of repair -- but Plaintiff fails to inform the Court that the generator is irrelevant to operation of the vessel because it only powers "comfort items" such as the refrigerator or air conditioning – not bilges or mechanical components.  (Ex. A at 2; Ex. C at 2.)

While Mr. WEBSTER did not leave the vessel plugged into shore power all the time, doing so was unnecessary because the batteries and bilge pumps worked before the February 3, 2016 incident, with the singular exception in November 2015 when the bilge was clogged by debris.  (*See* Doc. No. 39-3 at 22:18-23 and Ex. A at 2.)  PROGRESSIVE'S argumentative assertion that, on the evening of the accident, Mr. Keegan plugged the sump pump into an outlet

---

[2] The Affidavit of Mr. WEBSTER's expert marine surveyor, Mr. Richard Schiehl, is attached hereto and made a part herein as Exhibit C
[3] Mr. Keegan was also asked if he tested the bilge pumps, (Doc. No. 39-3 at 22:25-23:1), but that would have been unnecessary if the vessel was "completely dry" (*id*. at 22:22-23).
[4] The terms "dismantled" and "inoperable," like many terms in Plaintiff's Motion, are hyperbolic and inapplicable to the facts of this case.

that "failed" is utterly incorrect.  (*See* Doc. No. 39 at 4.)   That "GFCI"[5] outlet, (Doc. No. 39-3 at 31:11-12, 38:14-5 and 49:3-7), properly operated as required by law under the regulations and standards of the National Fire Protection Association ("NFPA")[6] that make the use of a GFCI at marinas in the United States mandatory [7] (Ex. D at 2;  Ex. E).   The GFI did not "fail" and it was not faulty; to the contrary, it was necessary and it worked like it was supposed to.  (Ex. C at 2; Doc. No. 39-4 at 79:6-9; Doc. No. 39-3 at 49:12-17.)

PROGRESSIVE's theory of the case assumes that rainwater accumulated in the vessel. However, speculation from any witness about the amount of rainfall in the weeks prior to the accident simply cannot be offered as a fact.  (*See* Doc. No. 39 at 4.)   Additionally, the assertion of "heavy rain" on the day of the accident cannot be accepted as a genuine fact, either.  (*See id*.) If the rainwater accumulation theory offered by the Plaintiff were assumed, this then also advances the fact that the bilge pumps worked the entire time, to include November 2015 when the pumps failed due to clogging debris, (Doc. No. 39-3 at 15:15 & 20:14-21; Ex. A at 2; Ex. B at 2), the month of December 2015 when the vessel was completely dry, (Doc. No. 39-3 at 22:18-23), the month of January 2016 when Mr. Keegan did not notice anything amiss with the FINAL DRAW, (*id*. at 23:2-6 and Ex. B at 1), until the evening of February 3, 2016 (Ex. B at 1).

PROGRESSIVE next offers the opinion of surveyor, Mr. Joe Godard, whose use of the phrase "lack of maintenance" with regard to the seat cushions and mildew is inapplicable and objectionable.[8]  (*See* Doc. No. 39 at 5.)   Mr. WEBSTER takes exception to Mr. Godard's

---

[5] "GFI" or "GFCI," stands for "ground fault interrupter" or "ground fault current interrupter" as evidenced by documentation of "Best Management Practices for Marina Electrical Safety" from the Association of Marina Industries, attached hereto and made a part herein as Exhibit D.
[6] The regulation for Marinas is NFPA 303, Section 5.12.6, attached and made a part hereof as Exhibit E.
[7] Reference is also made to NFPA 70, which refers to the National Electrical Code ("NEC") and the NEC's code on the use of GFIs at boatyards and marinas in Section 555.3.
[8]  It is obvious that it is usually colder in January than it is in February and March in the northern hemisphere.

description of the generator as "disassembled" and the one engine as "inoperable" simply due to a missing, easily replaceable serpentine belt. (*See id*.; *contra.*, Ex. B at 1 and Ex. C at 2.) Finally, the opinion of Mr. Godard that water leaked in through the rudder ports is not a fact but mere speculation. (Doc. No. 39 at 6.) In order to make this determination, Mr. Godard would have had to disassemble the rudder glands to determine if they were in fact faulty. (Ex. C at 1.) Furthermore, Mr. Godard never saw the vessel in water, and if he had he would have observed she was taut and watertight as evidenced by her floating without taking on water after being raised by Sea Tow after the accident. (*Id*.) While PROGRESSIVE presumes to present Mr. Godard's conclusions as fact, (Doc. No. 39 at 6), it ironically insists that the Court may not consider expert testimony on the issue of seaworthiness.[9] (Doc. No. 39 at 12-14.) Plaintiff's stance effectively wipes out Mr. Godard's conclusory and unsupported positions. (*Id*. at 6.)

PROGRESSIVE mistakenly posits an agreement between the experts on the issue of leaking rudder glands on the vessel. (*See id*.) To the contrary, at deposition Mr. Schiehl did *not agree* with Mr. Godard. Rather, he testified only that it was possible, that "[i]t could have come from a leaking rudder gland. It's not uncommon for the hex adjustable glands to leak or weep and –" but his response was cut-off. (Doc. No. 39-7 at 29:3-5.) Mr. Schiehl also strenuously disagrees with Mr. Godard's conclusion that the vessel sank due to lack of maintenance. (*Id*. at 30:19-22; Ex. C.) Mr. Schiehl did not opine as to a definite amount of time for the accumulation of water, simply because he, like anyone else, could not. (*Id*. at 52:3-9 and 54:20-25. Mr. Schiehl did not agree with Mr. Godard's assessment of the bilge pump operations, contrary to PROGRESSIVE's assertions otherwise. (*Id*.) As to the proper performance of maintenance on the bilge pumps and batteries, Mr. Schiehl offered "no opinion," which is a far cry from "did not

---

[9] This argument will be dealt with more fully *infra*.

dispute" Godard's allegations.  (Doc. No. 39-7 at 58:6-10.)  PROGRESSIVE's insistence that

Mr. Schiehl did not dispute "Mr. Godard's observation that water leaked into the vessel through

[the] corroded rudder ports" is incorrect:

> Q:  ….    "Inspection of the rudder ports at the stern revealed evidence of
> leakage as the components of the rudder ports are deteriorated."
> Did you observe that?
>
> A:  **Not deteriorated**.   There is some corrosion on the lower rudder
> bearings and packing glands.

(*Id*. at 58:11-18.)  As shown, Mr. Schiehl disputed the characterization of the rudder ports as

"deteriorated."  He testified that the sump pump was brought on board the FINAL DRAW

because certain bilge pumps failed to work in specific compartments.  (Doc. No. 39-7 at 43:11-

13.)

Plaintiff's statement of "undisputed facts" are controverted by record evidence, are

replete with exaggerated characterizations, and are not undisputed.

**Relevant Facts Presented by PROGRESSIVE in Dispute**

Fact numbers 1 through 7 in Plaintiff's Motion are totally and completely inaccurate or

contain enough inaccuracies or exaggerated circumstances as to make them disputed, repugnant

to the true facts, or irrelevant in nature.  Fact number 8 is correct, the GFI tripped as it was

manufactured and designed to do.

**Unstated Relevant and Undisputed Facts from the Defendant**

Mr. Godard had no knowledge of how long the FINAL DRAW had been sitting out on

land, open to elements and plugged, at Bahia Mar Marina.  (Doc. No. 39-5 at 13:4-15.)  He only

conducted a casual or visual inspection.  (*Id*. at 13:25-14:7.)

Mr. WEBSTER frequently visited his boat while it was docked behind Mr. Keegan's

house.  (Doc. No. 39-4 at 42:22-25 and Ex. A at 2.)  He had a plan in place to refurbish the

cosmetics (new cover, seat cushions and the like) of the boat and perform minor work in preparation for use of the vessel in the spring. (*See* Ex. A at 2 and Ex. C at 2.)

Mr. Schiehl testified that the seawater intake grates were only partially blocked by marine growth, in dispute with PROGRESSIVE's surveyor. (Doc. No. 39-7 at 50:6-10.) He also disagreed with Mr. Godard about the state of batteries; in his opinion they appeared to possibly have had a charge and that when he observed them they had been partially cleaned. (*Id*. at 57:10-23.) Additionally, Mr. Schiehl disputes the conclusions of Godard and testifies that the boat only showed evidence of "lack of usage," not lack of maintenance. (*Id*. at 58:19-23.)

Mr. Schiehl also offered a different conclusion for the sinking of the FINAL DRAW; detailing how the sump pump, once electrical power was lost, would act as a siphon bringing water back into the boat. (*Id*. at 28:8-20.) "[T]here's absolutely no way that the gradual lessening of freeboard[10] on the boat due to water being trapped in the engine compartment resulted in the sinking of the boat." (*Id*. at 28:20-24.)

Mr. Schiehl also testified that the FINAL DRAW was seaworthy and that the particular areas that PROGRESSIVE was focusing on were easily repairable items while she was docked behind Keegan's house. (*Id*. at 43:21-46:1 and 59:8-60:6.)

## MEMORANDUM OF LAW

**Standard of Review**

"A party may move for summary judgment, identifying each claim … on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[10] The freeboard on the boat may be described as the side-rails and portions of the vessel that ordinarily ride above the water, so "lessening of the freeboard" refers to the vessel going into the water for whatever reason.

law." Fed. R. Civ. P. 56(a). is the standard that guides the Court in the review of a motion for summary judgment.  The moving party bears the burden of meeting this exacting standard. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970).  This means that the moving party has the initial responsibility to identify to the Court those areas of the pleadings and discovery propounded, which it believes "demonstrates the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.

The court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor when determining if the movant has established that there is no genuine issue as to a material fact.  *See Jeffrey v. Sarasota White Sox*, 64 F.3d 590, 594 (11th Cir. 1995) *citing Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989); *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). The Eleventh Circuit has explained the reasonableness standard as this:

> In deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts.

*Id. quoting WSB-TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir. 1988).

If a reasonable fact finder then draws more than one inference from the facts, and that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *Id. citing Augusta Iron and Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988).  "The inquiry is 'whether the evidence presents a sufficient disagreement to require [trial].'" *Id. quoting Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986).

**Presumptions in an All Risk Policy Loss Dispute**

Much like the reproach by PROGRESSIVE, that the vessel owner cannot prove seaworthiness by merely claiming so, (Doc. No. 39 at 15-16), PROGRESSIVE cannot prove its

case by casting aspersions on the FINAL DRAW[11] (*see e.g.*, *id.* at 8 ("unseaworthy wreck"), 13 ("l[eft] to rot") & 16 ("deteriorating piece of junk"). As in the fact section of Plaintiff's Motion for Summary Judgment, there are some incorrect premises offered to the Court in argument. First the burdens of proof and the presumptions are a bit more obtuse than presented by PROGRESSIVE. *See e.g.*, *Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.*, 795 F.2d 940, 944 (11th Cir. 1988). Mr. WEBSTER does have the first burden of proof – the *proof of fortuity* in the occurrence of the accident.

Plaintiff has made clear that the policy coverage would only "pay for sudden, direct and accidental loss to a covered watercraft that is not caused by collision." (Doc. No. 14 at 2.) This is commonly referred to as an "all-risk" marine insurance policy. *Great Lakes Reinsurance (UK) PLC v. Kan-do, Inc.*, No. 15-11939, 2016 U.S. App. LEXIS 1166, at *5 (11th Cir. January 25, 2016). The United States Court of Appeals for the Eleventh Circuit has held that "all risk policies cover all 'fortuitous' losses…." *Id.* (citations omitted). The initial burden of proof is on the insured, but it is "not a particularly onerous one." *Id.* at *5-6 *quoting Morrison Grain Co., Inc. v. Utica Mut. Ins. Co.*, 632 F.2d 424, 430 (5th Cir. 1980).[12] The Court goes onto explain that the very purpose of all risks insurance was to protect "the insured in those cases where difficulties of logical explanation or some mystery surround the (loss of or damage to) property." *Id. quoting Morrison Grain* at 430. A "'fortuitous event' has been defined "as an event which, so far as the parties to the contract are aware, is dependent on chance. It may be beyond the power of any human being to bring the event to pass…." *LaMadrid v. Nat'l Union Fire Ins. Co,*

---

[11] Wreck is defined in legal phraseology as: "parts of vessels or their cargoes cast upon land by the sea." It can also mean "a ship cast ashore after being abandoned." Rene de Kerchove, *International Maritime Dictionary* 925 (2nd ed. 1964).

[12] The Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1980) (*en banc*).

*of Pittsburgh*, 567 Fed. Appx. 695, 701 n. 9 (11th Cir. 2014) *quoting Morrison Grain* at 430-31 (quoting Restatement (First) of Contracts § 291 cmt. A (1932)); *see also IAG LLC v. Nat'l Union Fire Ins. Co, of Pittsburgh*, No. 13-cv-1675-T-36TBM, 2015 U.S. Dist. LEXIS 117667 at *13 (M.D. Fl. Sept. 3, 2015) ("loss can be deemed fortuitous … where it was unforeseen, unexpected, unintended, unavoidable, or caused by the insured's own negligence").  At the very least, fortuity excludes intentional or fraudulent losses and normal wear and tear.  *Kan-do* at *6 (citation omitted).

Once the insured meets this burden the burden of proof shifts to the insurer to demonstrate that some language or clause in the policy excludes covering the loss. *Morrison Grain* at 431; *Jewelers Mut. Ins. Co. v. Balogh*, 272 F.2d 889, 892 (5th Cir. 1959).  Rather than stating that a vessel sinking at the dock is presumed to be unseaworthy, the law generally holds that it is presumed that a vessel is unseaworthy if it "sank in *calm weather* and seas."  *Kilpatrick* at 944 (emphasis added); *see also P.T. Tugs, Inc. v. U.S. Fire Ins. Co*., 796 F.2d 125, 127 (5th Cir. 1986); *Insurance Co. of North America v. Lanasa Shrimp Co*., 726 F.2d 688, 690 (11th Cir. 1984); *contra Resiman v. New Hampshire Fire Ins. Co*., 312 F.2d 17 (5th Cir. 1963).  This is a rebuttable presumption, however, if the shipowner can prove seaworthiness.  *Kilpatrick* at 944; *P.T. Tugs* at 127.  This in turn raises a "counter presumption that the loss was caused by a 'fortuitous suit of the sea.'"  *P.T. Tugs* at 127 *citing Darien Bank v. Travelers Indem. Co*., 654 F.2d 1015, 1021 (5th Cir. 1981).  This, in effect, brings the inquisitor "full circle," and if the Court arrives there it is a coverable loss.  *See Kilpatrick* at 945.  However, there is a wrinkle in this presumption chain:  In the Eleventh Circuit, the challenge that seaworthiness caused the loss is a burden on the insurer.  *Id. citing Saskatchewan Government Ins. Office v. Spot Pack*, 242

11

F.2d 385 (5th Cir. 1957).  In contrast, allegation of unseaworthiness at the inception of policy is a burden on the insured.  *Id.*

Defendant has met the "light" burden of showing a fortuitous loss.  *See generally Kan-do* at \*6; *IAG LLC* at \*15 ("failure of power was fortuitous").  Mr. Keegan and Mr. WEBSTER had found water in the FINAL DRAW once before in November 2015 and employing the sump pump and pulling away debris had solved the problem.  Furthermore, the bilge pumps worked after the November 2015 incident because no problem was observed in December 2015 and Mr. Keegan testified she was completely dry in January 2016.  Press on to February 3, 2016, and there should be no reason for Keegan to believe that using the sump pump again will not work this time.  Plugging the sump pump into a GFI was not only the prudent thing to do, it was there behind his house in compliance with code.[13]  Once pumped out, he could ascertain why the stern bilge pump had failed.  This then presumes a loss as a result of a peril of the sea.  *Sea generally Kilpatrick.*

If one is to assume the environment in the canal behind Mr. Keegan's house was made up of "calm weather and seas," which is debatable, this would place a presumption of unseaworthiness on the FINAL DRAW, but PROGRESSIVE alleged that this unseaworthiness caused the loss in its First Amended Complaint.  (*See* Doc. No. 14 at 4-6.)  PROGRESSIVE has thus failed to prove this, thus, failing to justify summary judgment, but as Mr. WEBSTER must rebut the notion of unseaworthiness for the inception and status of the policy, seaworthiness will be discussed *infra*.

---

[13]  Mr. Keegan's house is not a commercial marina, but it is not only wise and prudent to place a GFI outlet for use near water, it is pursuant to building codes.  NFPA 70:  National Electrical Code section 555.3 for Marinas and Boatyards states:  "**Ground-Fault Protection**.  The main overcurrent protection device that feeds the marina shall have a ground fault protection not exceeding 100mA.  Ground-fault protection of each individual branch or feeder circuit shall be permitted as a suitable alternative."  Mr. Keegan is a building contractor.  (Doc. No.39-3 at 8:22-9:1.)

**Seaworthiness of the FINAL DRAW**

"Seaworthiness, it is well known, is a *relative term*." *May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft*, 290 U.S. 333, 346 (1933) (emphasis added). In order to sustain the burden of proving unseaworthiness, "the plaintiff [in Jones Act seaman cases] must show that vessel, including its appurtenances, gear, and equipment, was not reasonably fit for its *intended purpose*." 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 6-26 (5th ed. 2011) (emphasis added); *see also Lloyds U.S. Corp. v. Smallwood*, 719 F.Supp. 1540, 1549 (M.D. Fla. 1989) *citing Aguirre v. Citizens Casualty Co*., 441 F.2d 141, 144 (5th Cir. 1971). This is in the "Seamen" section of the treatise; in the marine insurance section a vessel is deemed seaworthy when she is "reasonably fit in all respects to encounter the ordinary perils of the seas of the adventure insured." 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 19-16 (5th ed. 2011). The standard is not perfection but reasonableness. *Id*.

Under the so-called American Rule, in charter party and cargo cases, the owner warrants the seaworthiness of his vessel at the inception or attachment of a time policy. *Smallwood* at 1549. There is also a "negative warranty" of seaworthiness, and this does not mean an absolute continuous state of seaworthiness, but means "that the Owner, from bad faith or neglect, will not knowingly permit the vessel to *break ground* in an unseaworthy condition." *Id. quoting Spot Pack*, 242 f.2d at 388 (emphasis added); *P.T. Tugs*, 796 F.2d at 126*; accord Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*, 952 F.Supp. 1046, 1070 (S.D.N.Y. 1997).

Given the law above, and the facts of this case, Mr. WEBSTER's vessel, FINAL DRAW was seaworthy; seaworthy for her intended purpose. However, to be clear the negative warranty of seaworthiness is difficult to apply in this circumstance. Mr. WEBSTER did not "break ground" with the vessel; she was at Bill Keegan's house for an intended purpose – to replace the

13

upholstery, work on the aesthetics and perform minor repairs – so she was ready for use in the spring.  She was reasonably fit for her intended purpose, i.e., awaiting repairs.  This is what Mr. Schiehl was referring to when he spoke of "port-risk."  (See Doc. No 39-7 at 59:-60:6.)

An additional point is to discuss the weather, it is debatable that the weather could be termed "calm."  For a boat that size, the amount of rain was more than usual – to be sure – not enough to swamp, contrary to Godard's theory of sinking, but it did make Mr. Keegan go out and put the sump pump in the boat to drain the water out.   Then, if not for the tripping of electrical power to the sump pump, the hose of the pump would not have reversed and pulled water back into the boat, pursuant to Mr. Schiehl's opinion and conclusion for the sinking.  This chain of events began with the rain, not exactly calm weather for a vessel this size, which could and did lead to an incident.  This fact diminishes the presumption of unseaworthiness when sinking in calm waters.

However, even if Mr. WEBSTER would be compelled to show the FINAL DRAW was seaworthy in rebuttal of any presumption, that has been done and could be done at trial as well.  Mr. WEBSTER had well maintained the boat, but then he was busy in 2015 and he could not perform the cosmetic renovations that he had earlier contemplated.  (Ex. A through C.)  Despite this he visited the vessel frequently and Mr. Keegan inspected the boat every month, turning on the engines.  He discovered a squeaking in the serpentine belts and was in the midst of replacing them and was merely waiting for warmer weather to complete the task.  (Ex. A and B.)  Additionally, as evidenced by the testimony, in both deposition and affidavit, by Mr. Schiehl, the items that PROGRESSIVE focused on to determine unseaworthiness were really cosmetic in nature or minor deficiencies.  (Ex. C and Doc. No. 39-7 at 43:21-46:1.)

Additionally, the only evidence PROGRESSIVE has to offer for showing unseaworthiness is that from its expert, Mr. Godard.  But Mr. Godard did not know how long the vessel had been left open to elements on land at Bahia Mar, basically untouched by anyone since being raised from significant submersion.  (Doc. No. 39-5 at 13:4-15.)  In this regard, he testified that the mildew on the seats could not have accumulated while sitting at Bahia Mar because of the cold weather.  (*Id*. at 15:12-22.)  Obviously, it was colder in December and January than it was in February and, even more so in March when he conducted his casual inspection.  (*See id.* at 13:25- 14:7.)

All of this either rebuts a presumption of unseaworthiness on the FINAL DRAW, or more importantly in regard to Plaintiff's Motion, it raises a substantial number of genuine issues of material facts that just do not support the granting of summary judgment for any of its causes of action.

**Experts**

PROGRESSIVE expends a good deal of ink on the preclusion of expert testimony, specifically from stating the word seaworthy or any of the related words to that root word.  (Doc. No. 39 at 12-13.)[14]  Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[14]  WEBSTER questions the applicability of judicial decisions on *in limine* motions from districts in Pennsylvania and Kentucky to the instant case and pleadings.

*Skye v. Maersk Line Limited Corp*., No. 11-21589, slip op. at 2 (S.D. Fla. April 13, 2012) *quoting* Fed. R. Evid. 702.  District courts are "to ensure 'that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"  *Id. quoting Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 597 (1993).  There will be some overlap with review of the basic requirements, i.e., qualification, reliability and helpfulness, but these requirements are distinct as concepts and each must be reviewed to adequately determine the admissibility of testimony from the expert.  *See Fisher v. Carnival Corp*., No. 11-22316, slip op. at 5 (S.D. Fla. May 17, 2013).

"[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Skye*, No. 11-21589, slip op. at 4 (quoting *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999)).  And, while the inquiry is "a flexible one," the focus "must be solely on principles and methodology, not on the conclusions that they generate."  *Daubert* at 594-95.

This should be the focus of the Court, not quashing experts from speaking the word seaworthiness.  PROGRESSIVE argues a distinction without a difference.  The experts, if qualified and have useful and reliable evidence to offer, should be heard in accordance with the Supreme Court holdings of *Daubert* and *Kumho*.  This is even more the standard considering that not only is this Honorable Court the "gatekeeper" but the finder of fact.  A federal judge should hear the opinionated conclusion of an expert rather than listen to items and data that lead up to but not into that conclusion.  The information is more reliable and useful when presented as to why the particular expert believes that the evidence proves his opinions and conclusions.

**FINAL DRAW Sank Due to an Outage of Shore Power**

The case of the M/Y Kan-Do is analogous to the instant case.  *Great Lakes Reinsurance (UK) PLC v. Kan-Do, Inc*., No. 12-cv-2923-T-33TGW, 2014 U.S. Dist. LEXIS 81541 (M.D. Fla.

June 16, 2014) (aff'd in part and rev'd in part, *Great Lakes Reinsurance (UK) PLC v. Kan-Do, Inc.*, No. 15-11939, 2016 U.S. App. LEXIS 1166 (11th Cir. Jan. 25, 2016)). A blown fuse caused a power outage to the Kan-Do causing her bilge pumps to not work and allowing her to sink. *Kan-Do* at *2. The district court found that this was a fortuitous event and denied Great Lakes' Motion for Summary Judgment. *Id.* at *14-15. The Eleventh Circuit affirmed this finding, holding that "[w]e have long held that requiring insurance claimants to prove the 'precise cause' of loss or damage in order to recover under an 'all-risk' insurance policy is 'inconsistent with the broad protective purposes of 'all risks' insurance." *Kan-Do*, No. 15-11939, 2016 U.S. App. LEXIS 1166 at *7 (quoting *Morrison Grain*, 632 F.2d at 430).

Likewise, in *IAG LLC*, a power outage caused a loss of power to the bilge pumps and the vessel sank due to the lack of the bilge pumps. *IAG LLC*, No. 13-cv-1675-T-36TBM, 2015 U.S. Dist. LEXI 117667 at *3. "The fact that the boat was connected to shore power makes the loss of power to the bilge pumps far more unexpected and unexplained. This failure of power was fortuitous." *Id.* at *15. The *IAG LLC* Court went onto distinguish its finding from *J&A Fleeting, Inc. v. Fireman's Fund McGee Marine Underwriters*, No. 03-cv-217-HRW, 2006 U.S. Dist. LEXIS 81 (E.D. Ky. Jan. 3, 2006). *Id.* at *18. The distinguishing factor was that there was no power outage in the case of the *J& Fleeting*. *Id.* It should be noted that the IAG LLC decision is closer in proximity, both temporally and by location.

Clearly, the outage was fortuitous in the instant case. Witnesses testified truthfully that the GFI tripped and that it had tripped before – that is what GFIs do – especially near water. The sump pump had worked before without tripping the GFI, there was no reason for Mr. Keegan to suspect that it would quit, but even much less that the pump would reverse syphon water back into the boat, if and when it quit. Mr. Schiehl's opinion on what caused the FINAL DRAW to

sink is a cogent and well thought out scenario, more likely than uninspected rudder glands leaking so much that 1.5 inches of rain was enough to swamp the yacht on the evening of February 3, 2016.

## CONCLUSION

The outline of the chain of presumptions provided *supra*, demonstrates that the burdens of proof and the shifting presumptions are not as simple as the Plaintiff would have the Court believe.  There is fortuity of the event, seaworthiness at the dock but also burdens that apply when alleging the cause of loss was due to unseaworthiness, then rebuttals of unseaworthiness, if necessary to end back at the fortuitousness of a "peril of sea."

PROGRESSIVE has failed to navigate these burdens and presumptions and the Court is left with several genuine issues of disputed material facts.  PROGRESSIVE has failed to present even one undisputed fact of import in this case, therefore, this Honorable Court should deny Plaintiff's Motion for Summary Judgment.

In light of all of the above, genuine issues of material fact exist with respect to all three (3) Causes of Action filed by PROGRESSIVE in its First Amended Complaint, so that its motion for summary judgment should be denied in all aspects.

**WHEREFORE**, based upon all of the foregoing, the Defendant respectfully requests that the Motion for Summary Judgment of Plaintiff, PROGRESSIVE AMERICAN INSURANCE CO., be denied in all aspects and for whatever other relief that this Court deems just and proper.

Respectfully submitted,

/s/ Kris Elliott_____
Kris Elliott, Esq.
Fla. Bar No. 733741
ELLIOTT LAW FIRM, P.A.
Dr: 362 Gulf Breeze Pkwy 118
215 Fairpoint Dr., Ste. A
Gulf Breeze, FL  32561
Tel. (850) 677-0567
Fax (850) 254-7822
kris@elflaw.com
*Co-counsel for Plaintiff*

-and-

Sharon D. Regan, Esq.
Fla. Bar No. 907308
REGAN & ROARK,
ATTORNEYS AT LAW
125 S. Alcanis St., Ste. One
Pensacola, Florida *32552*
Tel. (850) 439-1000
Fax  (850) 439-1002
sharonregan@hotmail.com
*Co-Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd   day of August 2017, a true and correct copy of the

foregoing document was served electronically via the Court's CM/ECF system to the attached

List of Service.

s/ Kris Elliott_____
Kris Elliott

19

## SERVICE LIST

Steven Goldman, Esq.
GOLDMAN & HELLMAN
233 Harvard St., Suite 211
Brookline, MA 02446
segoldman@aol.com